In re **LERNOUT & HAUSPIE SECURITIES LITIGATION**

Gary B. **Filler**, et al., Plaintiffs,

v.

Jo **Lernout**, et al, Defendants.

**Stonington Partners, Inc.,** et al, Plaintiffs,

v.

Carl **Dammekens**, et al., Defendants.

Paul G. **Bamberg**, et al., Plaintiffs,

v.

**KPMG, LLP,** et al., Defendants.

Janet **Baker**, et al., Plaintiffs,

v.

**KPMG, LLP,** et al., Defendants.

Nos. 00–CV–11589–PBS, 02–CIV–10302–PBS to 02–CV–10304–PBS.

United States District Court, D. Massachusetts.

Jan. 13, 2003.

Steven E. Cauley, Cauley Geller Bowman & Coates, Little Rock, AK, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, W. Todd Ver Weire, Cauley Geller Bowman & Coates, LLP, Little Rock, AR, Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, Curtis L. Bowman, Cauley Geller Bowman & Coates, James P. Bonner, Shalov Stone & Bonner, New York, NY, for Sandra Balan, Plaintiff.

Alicia M. Duff, Berman, DeValerio & Pease, Boston, MA, Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA, Paul J. Geller, Cauley & Geller, LLP, Boca Raton, FL, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Lee S. Shalov, Ralph M. Stone, Shalov Stone & Bonner LLP, New York, NY, Gene Cauley, Cauley & Geller LLP, Little Rock, AR, Kenneth A. Ricken, Shalov Stone & Bonner, New York, NY, for Hans A. Quaak.

Alicia M. Duff, Berman, DeValerio & Pease, Boston, MA, Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA, Paul J. Geller, Cauley & Geller, LLP, Boca Raton, FL, Steven E. Cauley, Cauley Geller Bowman & Coates, Little Rock, AK, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Lee S. Shalov, Ralph M. Stone, Shalov Stone & Bonner LLP, New York, NY, Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Karl Leibinger.

Alicia M. Duff, Berman, DeValerio & Pease, Boston, MA, Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA,

Paul J. Geller, Cauley & Geller, LLP, Boca Raton, FL, Steven E. Cauley, Cauley Geller Bowman & Coates, Little Rock, AK, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Attilio Po.

Alicia M. Duff, Berman, DeValerio & Pease, Boston, MA, Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA, Robert P. Frutkin, Savett Frutkin Podell & Ryan, PC, Philadelphia, PA, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Stephen N. Maskaleris.

Robert P. Frutkin, Savett Frutkin Podell & Ryan, PC, Philadelphia, PA, Bernard M. Gross, Deborah R. Gross, Law Office of Bernard M. Gross, PC, Philadelphia, PA, for Marguerite J. Cammann.

Stuart H. Savett, Robert P. Frutkin, Savett Frutkin Podell & Ryan, PC, Philadelphia, PA, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, Barbara A. Podell, Savett, Frutkin, Podell & Ryan, P.C., Philadelphia, PA, for Thomas H. Bown, II,

Alicia M. Duff, Berman, DeValerio & Pease, Boston, MA, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Daniel J. Perrington.

Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Steven Roskin, Larry A. Rosenmann, Lee Herskowitz,

Gary C. Downey, Samer M. Ali, Gabriel, Inc. Pension and Profit Sharing Plan.

Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA, Richard A. Lockridge, Lockridge, Grindal, Nauen & Holstein, Minneapolis, MN, Paul J. Geller, Cauley & Geller, LLP, Boca Raton, FL, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Glen De-Valerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Matthias Weis.

Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA, Lisa J. Rodriguez, Rodriguez & Richards, LLC, Thomas L. Earp, Earp Cohn P.C., Westmont, NJ, Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Michael D. Donovan, David A. Searles, Donovan Searles, LLC, Philadelphia, PA, Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Anthony Drummond.

Robert P. Frutkin, Savett Frutkin Podell & Ryan, PC, Philadelphia, PA, for Sylvia B. Piven, Irene Godrey, Michael Wytanis.

William R. Moorman, Stephen Wald, Craig & Macauley, P.C., Boston, MA, for Gaston Bastiaens.

Arnold P. Messing, Choate, Hall & Stewart, Boston, MA, Michael P. Carroll, Davis, Polk & Wardwell, New York, NY, Diem–Suong T. Nguyen, Davis Polk & Wardwell, New York, NY, Kevin J. Lesinski, Seyfarth Shaw, Boston, MA, for KPMG LLP.

John B. Missing, Herbert Thomas, Ellen D. Marcus, Debevoise & Plimpton, Washington, DC, for Dirk Cauwelier, Fernand Cloet, Marc Depauw, Jan Coene, Hubert Detremmerie.

Michael A. Collora, Dwyer & Collora, Boston, MA, Donald Chase, Franklin R. Weissberg, David A. Piedra, Peter D. Weinstein, Morrison Cohen Singer & Weinstein, LLP, New York, NY, Gordon M. Jones, James S. Dittmar, Robert P. Sherman, Sanjit S. Korde, James O. Fleckner, Hutchins, Wheeler & Dittmar, Boston, MA, for Pol Hauspie.

Donald Chase, Franklin R. Weissberg, Peter D. Weinstein, Morrison Cohen Singer & Weinstein, LLP, New York, NY, Rachelle L. DeGregory, Morrison Cohen Singer & Weinstein, LLP, New York, NY, James S. Dittmar, Sanjit S. Korde, Boston, MA, for Nico Willaert.

Donald Chase, Franklin R. Weissberg, David A. Piedra, Peter D. Weinstein, Morrison Cohen Singer & Weinstein, LLP, New York, NY, Rachelle L. DeGregory, Morrison Cohen Singer & Weinstein, LLP, New York, NY, for L & H Investment Co. N.V.

William Shields, Jonathan I Handler, Day, Berry & Howard, Boston, MA, Bruce A. Baird, Covington & Burling, Washington, DC, Jason A. Levine, Paul W. Schmidt, Covington & Burling, Washington, DC, William D. Iverson, Covington & Burling, Washington, DC, for Microsoft Corp.

Andrew Good, Silverglate & Good, Boston, MA, Roger E Zuckerman, Zuckerman Spaeder LLP, Washington, DC, Steven M. Salky, Zuckerman Spaeder LLP, Washington, DC, for Louis H. Verbeke.

Michael P. Connolly, Murtha Cullina Roche Carens & DeGiacomo, Boston, MA, Frank Rozzano, Dickstein Shapiro Morin & Oshinsky, LLP, Tara J. Holubar, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, for Ellen Spooren.

Robert J. Kaler, Gadsby & Hannah LLP, Boston, MA, for Flanders Language Valley Fund.

David H. Braff, Bradley A. Harsch, Sullivan & Cromwell, New York, NY, Douglas H. Meal, Emily F. Klineman, Ropes & Gray, Boston, MA, Philip L. Graham, Jr., Stephanie G. Wheeler, Sullivan & Cromwell, New York, NY, Theodore Edelman, Sullivan & Comwell, London, England, for KPMG UK.

Vincent M. Amoroso, Erik Lund, Posternak, Blankstein & Lund, Boston, MA, David N. Ellenhorn, Louis M. Solomon, Teresa A. Gonsalves, Solomon, Zauderer Ellenhorn, Frischer & Sharp, New York, NY, Andre K. Cizmarik, Solomon Zauderer, Ellenhorn, Frischer et al., New York, NY, Janet B. Fierman, Cohen & Fierman, LP, Boston, MA, Robert M. Cohen, Cohen & Fierman, LLP, Boston, MA; John W. Polk, Baker & McKenzie, Washington, DC, for Paul Behets.

Nelson Callahan, John A.D. Gilmore, Hill & Barlow, Boston, MA, for Bernard Vergnes.

Vincent M. Amoroso, Erik Lund, Posternak, Blankstein & Lund, Boston, MA, George A. Salter, John A. Redmon, Nicholas W.C. Corson, Hogan & Hartson, LLP, New York, NY, KPMG Belgium.

Anthony M. Feeherry, Gus P. Coldebella, Sarah E. Walters, Goodwin Procter, LLP, Boston, MA, for Jo Lernout.

Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA, Jack I. Zwick, David C. Katz, Weiss & Yourman, New York, NY, Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, Joseph H. Weiss, Weiss & Yourman, New York, NY, for Gerhard Heitmann.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Plaintiffs allege that defendants Flanders Language Valley Fund c.v.a. ("FLV"), Mercator and Noordstar, N.V. ("Mercator"), and Louis H. Verbeke participated in a scheme and course of business to defraud the securities market, by setting up, funding, and operating sham entities designed to enter into bogus software licensing agreements with Lernout & Hauspie ("L & H"), a speech recognition software firm, and thereby artificially to inflate L & H's profits, in violation of the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j, and its implementing regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5, as well as common law.[1]

Defendants have moved to dismiss on the ground that *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) forecloses all private actions under § 10(b) and Rule 10b–5 against persons whose actions in a scheme to defraud do not directly impact the securities market. Concluding that § 10(b) and Rule 10b–5 should not be read so restrictively, the Court *DENIES* FLV's and Mercator's motion to dismiss the federal securities claims against them, but *ALLOWS* Verbeke's motion to dismiss the federal securities claim against him. However, the Court *DENIES* Verbeke's motion to dismiss the aiding-and-abetting-common-law-fraud claims against him. The Court also *DENIES* FLV's and Mercator's motions to dismiss the aiding-and-abetting claims against them.

---

**1.** Class plaintiffs assert only federal securities claims against FLV, Mercator, and Verbeke. Filler plaintiffs assert federal securities claims and aiding-and-abetting-common-law-fraud claims against FLV and Mercator. The Stonington plaintiffs and the Baker/Bamberg plaintiffs assert only common law aiding-and-abetting claims against FLV, Mercator, and Verbeke.

## FACTUAL ALLEGATIONS[2]

Except where otherwise stated, the factual allegations are drawn from the class plaintiffs' Amended Complaint.

### I. Overview of the "Strategic Partners" Scheme

One of the schemes that L & H used to artificially inflate its revenues involved certain "strategic partners" of L & H. These strategic partners were start-up software companies, dubbed Language Development Companies ("LDCs") and Cross–Language Development Companies ("CLDCs"). L & H, along with FLV and Mercator, set up thirty LDCs and CLDCs. These strategic partners entered into license agreements with L & H. The agreements had three basic terms: (1) the strategic partners would take L & H's language-recognition software, and modify it for specific applications or languages; (2) during the development process, the strategic partners would pay licensing fees to L & H; and (3) at the end of each license agreement, L & H had the option—which was generally exercised—to acquire the strategic partners and the developed product.

Thus, to the outside world, it appeared that the strategic partners entered into license agreements that obligated them to bear the cost and risk of software development. Moreover, it appeared that the strategic partners were providing significant licensing revenues to L & H. In total, L & H booked $79 million in strategic-partner revenue. The strategic partners accounted for 10% of L & H's 1998 reported revenues, and 25% of its 1999 reported revenues.

In reality, the strategic partner relationships were shams. While L & H claimed that the strategic partners were independent, unaffiliated entities, in fact most were owned by undisclosed related parties, including FLV and Mercator. L & H fraudulently booked the licensing revenues from the strategic partners.

Moreover, the strategic partners were shell companies, without the resources to perform the research and development on software. In fact, according to the Stonington complaint, the strategic partners shared common addresses in Singapore and common bank accounts, were inadequately capitalized, had no employees, and had no general ability to conduct any business on their own. Instead, L & H and its employees would perform the research and development for the strategic partners, bearing all costs. But L & H did not book these research and development costs as L & H liabilities.

When L & H purchased the strategic partners, however, L & H capitalized the majority of the purchase price as goodwill; the "goodwill" included the amounts spent on research and development. As a capitalized asset, L & H was able to amortize the cost of goodwill over an extended time period, rather than treating the research and development costs as an expense that would immediately reduce earnings.

In sum, the strategic-partner scheme artificially inflated L & H's profit statements, both by providing L & H with license revenues from the strategic part-

---

**2.** This is the fifth opinion addressing various motions to dismiss in this case. *See In re Lernout & Hauspie Sec. Litig.,* 208 F.Supp.2d 74 (D.Mass.2002) (*"Lernout I"*) (the officers); *In re Lernout & Hauspie Sec. Litig.,* 230 F.Supp.2d 152 (D.Mass.2002) (*"Lernout II"*) (the auditors); *In re Lernout & Hauspie Sec. Litig.,* 286 B.R. 33 (D.Mass.2002) (*"Lernout III"*) (the directors); *Bamberg v. SG Cowen,* 236 F.Supp.2d 79 (D.Mass.2002) (*"Lernout IV"*) (the investment analyst). Familiarity with the facts set out in the earlier opinions is presumed.

ners (for licenses to software that the strategic partners had no intention or capability of developing), and by allowing L & H to amortize research and development expenses.

The scheme also benefitted FLV, Mercator, and Verbeke. First, FLV and Mercator received a striking return on their investments in the strategic partners. Their risk was minimal, given L & H's general practice of exercising its options to buy the strategic partners at purchase prices substantially in excess of the costs of setting up, funding, and operating the strategic partner. Second, Mercator and Verbeke had a significant ownership interest in L & H. By artificially inflating the price of L & H stock, Mercator and Verbeke increased the value of their own holdings.

Thus, the heart of the allegations against FLV, Mercator, and Verbeke is that, motivated by personal profit, they participated in setting up, funding, and operating shell companies, knowing that these companies were designed solely to inflate artificially L & H's bottom line. The plaintiffs do not allege, however, that FLV, Mercator, or Verbeke directly interacted with the securities market as part of the scheme; rather, L & H was the interface between the scheme and the market.

## II. FLV's Role in the Scheme

FLV is a Belgian venture-capital fund, with United States offices in Los Altros Hills, CA, and Woburn, MA. Defendants Jo Lernout and Pol Hauspie created FLV in 1995, and were directors of the fund's management arm from 1995 until 1997. According to the *Wall Street Journal*— which, as discussed in *Lernout I*, broke the story of securities fraud at L & H—Lernout and Hauspie maintained "considerable sway" over FLV's affairs even after 1997.

According to a former channel sales manager from L & H's Burlington, MA office, L & H sales representatives routinely told customers that if they acquired or licensed L & H products, FLV would make an investment in the customer; the L & H representatives noted that there was no real separation between L & H and FLV. "I always thought they were the same thing, because of the attitude we had, the positioning," said the former channel sales manager. During presentations to potential customers, L & H sales and marketing representatives would describe the FLV Fund as a potential investor; the L & H representatives devoted a portion of a slide presentation to FLV and how it worked. L & H told certain potential customers that L & H could secure an investment in the customer from FLV, but only if the customer agreed to kick back a substantial percentage of that investment to L & H in the form of license payments.

In 1996—prior to the class period—L & H formed Dictation Consortium N.V. ("Dictation") to develop software for L & H. L & H then turned to friends as "outside" investors to fund Dictation. As a result of L & H's efforts, on December 31, 1996, FLV and FLV Management (FLV's management arm) invested in Dictation, for a total stake of 61% of the company. This stake was reduced to 43% in 1997.

In December 1996, L & H entered into a profitable licensing agreement with Dictation. Pursuant to this agreement, Dictation provided L & H with $26.6 million in revenue, or 25% of L & H's 1996 sales and 19% of L & H's 1997 sales. Meanwhile, between December 1996 and early 1998, Dictation supposedly developed new language recognition software, purportedly bearing the research and development costs. In fact, Dictation did not perform any of the research and development;

rather, L & H employees did the software work under contract.

L & H had the option to purchase Dictation when the software development was complete. In May 1998, L & H exercised this option, purchasing Dictation for $40 million. The purchase resulted in significant gains for Dictation's investors, including FLV. The Dictation fraud provided the template for the strategic-partner scheme, which the *Wall Street Journal* later described as a "Dictation Consortium-type structure—but on steroids."

During the class period, FLV owned or funded eight of the thirty strategic partners. Specifically, in 1999 FLV invested $8 million for a 49% stake in four start-up companies based in Singapore: I–Merge Pte., I–Office Pte., I–Mail Pte., and I–News Pte. Also in 1999, FLV paid $10 million to obtain ownership of four additional start-ups in Singapore; $8 million of FLV's money was used to pay license fees to L & H. FLV disposed of its ownership in the latter four start-ups prior to December 31, 1999, by selling them to HI World for $11 million—a 10% return on the investment FLV had made only months earlier.

In addition to the above eight start-ups, an additional four companies were organized in late 1998 as subsidiaries of Language Investment Company ("LIC"), whose chief executive officer, William Hardeman, is an FLV Fund director. LIC founded these start-ups at the behest of L & H. The start-ups each paid L & H $1.5 million in license fees in December 1998. In December 1999, LIC sold the companies to Velstra, which (as described below) is owned almost exclusively by Mercator.

### III. Mercator's Role in the Scheme

Mercator is an insurance company located in Antwerp, with significant ties to L &

H. First, Mercator has an equity interest in L & H. Mercator owns 6.9% of L & H Holding, which in turn owns 8.9% of L & H; L & H Holding is 85% owned by L & H. Mercator also directly owns 0.2% of L & H's common stock. In total, Mercator owns approximately 0.82% of L & H. Second, Mercator's chairman, Verbeke, was also a named partner at L & H's chief Belgian law firm, Loeff Claeys Verbeke; Verbeke personally owns 8.9% of L & H Holdings. Verbeke was present at L & H Board meetings where related-party transactions were discussed. Third, Tony Snauwaert, the delegate-director/manager of the Language Development Fund— which is 96% owned by Mercator—was described as "Pol Hauspie's right hand" in a January 24, 2001 article in *De Financieel–Exonomische Tijd*, a Belgium business publication.

According to the *Wall Street Journal*, Mercator was the ultimate owner of sixteen of the thirty start-up LDCs and CLDCs: Taiwanese LDC, Malay LDC, Vietnamese LDC, Urdu LDC, Thai LDC, Hindi LDC, Tamil LDC, Italian CLDC, French CLDC, German CLDC, Slavic LDC, Bahassa LDC, Czech LDC, Greek LDC, Polish LDC, and Hungarian LDC. Mercator owned these start-ups through several intermediary entities. The start-ups were directly owned by Velstra, a Singapore-based company. Velstra is 100% owned by Language Development Fund ("LDF"), which in turn is 96% owned by Mercator.

During the class period, Mercator invested $2 million in LDF, and loaned LDF an additional $10 million to be repaid by September of 1999. These funds were then used by the LDCs to pay L & H, inflating L & H's purported revenues. The 16 start-ups owned by Mercator paid a total of $53 million in licensing fees to L & H during 1998 and 1999.

## IV. Verbeke's Role in the Scheme

Verbeke is believed to be a Belgian citizen. As discussed above, Verbeke was both chairman of Mercator and a named partner at the law firm of Loeff Clays Verbeke. Loeff Clays Verbeke served as legal counsel to both L & H and FLV. Verbeke attended almost all L & H board of directors meetings, including those where related-party transactions—including those involving FLV—were discussed.

While the Amended Class Complaint contains allegations that support Verbeke's knowledge of the strategic-partners scheme, the Amended Class Complaint does not include allegations of Verbeke's particular participation in the scheme. The Stonington Amended Complaint states, "Upon information and belief, the legal work involved in creating these start-ups [the 30 strategic partners] was performed in whole or in part by Verbeke, in his capacity as a partner of Loeff Claeys." The Baker/Bamberg Amended Complaint makes virtually identical allegations.

## LEGAL ANALYSIS

### I. Claims under § 10(b) and Rule 10b–5

#### A. Textual Analysis

The Court must first examine the scope of liability for participation in a fraudulent scheme under § 10(b) and Rule 10b–5. *See SEC v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899, 1901 n. 1, 153 L.Ed.2d 1 (2002) ("The scope of Rule 10b–5 is coextensive with the coverage of § 10(b).").

■ The Supreme Court has stressed that § 10(b) "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Id.* at 1903 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). This flexibility is necessary to realize the goal of Congress: "'substitut[ing] a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Id.* (quoting *Affiliated Ute*, 406 U.S. at 151, 92 S.Ct. 1456).

The Supreme Court, however, has emphasized that there is a limit on a court's freedom in construing the coverage of § 10(b): the court must anchor its interpretation in the statutory text. As the Supreme Court has stated, in determining "the scope of conduct prohibited by § 10(b), the text of the statute controls our decision." *Central Bank*, 511 U.S. at 172, 114 S.Ct. 1439; *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("[W]e turn first to the language of § 10(b), for '(t)he starting point in every case involving construction of a statute is the language itself.'") (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)).

Thus, the Court begins with the language of § 10(b):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange....
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5 states:

It shall be unlawful for any person, directly of indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. Ch. II § 240.10b–5. Class plaintiffs allege that FLV, Mercator, and Verbeke engaged in activities prohibited by (a) and (c) of Rule 10b–5.

In *Ernst & Ernst,* the Supreme Court construed § 10(b)'s "manipulative device or contrivance" language as covering fraudulent schemes. *See* 425 U.S. 185, 199 n. 20 & 21, 96 S.Ct. 1375, 47 L.Ed.2d 668. In defining these terms, the Supreme Court relied on *Webster's New International Dictionary of the English Language* (2d ed.1934), a dictionary that was published contemporaneously with the passage of § 10(b). *See id.* The Supreme Court observed that the term "device" embraces "a scheme to deceive," and that the term "contrivance" covers "a scheme, plan, or artifice." *Id.* at 199 n. 20, 96 S.Ct. 1375. The Supreme Court also noted that "manipulate" was defined as "to manage or treat artfully or fraudulently; as to manipulate accounts . . . [t]o force (prices) up or down, as by matched orders, wash sales, fictitious reports . . . to rig." *Id.* n. 21, 96 S.Ct. 1375.

In *Santa Fe v. Green,* the Supreme Court stated "[m]anipulation is 'virtually a term of art when used in connection with securities markets,'" quoting *Ernst & Ernst,* 425 U.S. at 199, 96 S.Ct. 1375, and "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). But the Supreme Court stressed that despite its status as a "term of art," the term "manipulative" does not limit § 10(b)'s coverage to traditional securities schemes such as wash sales or matched orders; to the contrary, "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Id.* at 477, 97 S.Ct. 1292. Indeed, in *Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Company,* the Supreme Court quoted with approval the following passage from a Second Circuit opinion:

[We do not] think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b–5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden variety type of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

404 U.S. 6, 11 n. 7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (quoting *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2nd Cir. 1967)).

But while it is well-established that § 10(b) and Rule 10b–5 cover fraudulent schemes, no matter how novel, the Su-

preme Court has never addressed the extent to which § 10(b) and Rule 10b–5 proscribe participation in such schemes. The literal language of § 10(b) sanctions persons who "*directly or indirectly* ... use or employ ... any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j (emphasis added). Rule 10b–5 likewise covers those who "directly or indirectly" engage in proscribed conduct. 17 C.F.R. § 240.10b–5. The 1934 dictionary relied on by the *Ernst & Ernst* Court provides several definitions for the terms "directly" and "indirectly." *See Webster's New International Dictionary of the English Language* (2d ed.1934) at 738, 1261. For "directly," the definitions include "without anything intervening; personally," and for "indirectly," the definitions include "not directly." *Id.*

### B. *Central Bank*

Relying on *Central Bank,* defendants take the position that to constitute a primary violation of the securities laws, an act must be one that directly impacts the securities market. Defendants argue that only L & H directly interacted with the market—by releasing financial statements that misstated its revenues from the strategic partners—and therefore plaintiffs only relied on L & H's fraud.

In *Central Bank,* the defendant was alleged to have aided and abetted a securities fraud by *refraining* from conducting a review of a real estate appraisal. *See* 511 U.S. at 167–68, 114 S.Ct. 1439. The Supreme Court observed that such allegations of secondary liability cannot meet the reliance requirement for private suits under Rule 10b–5. *Id.* at 180, 114 S.Ct. 1439. The Supreme Court stated that "[w]ere we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abetter's

statements or actions." *Id.* Because the *Central Bank* plaintiffs "concede[d] that Central Bank did not commit a manipulative or deceptive act within the meaning of § 10(b)," 511 U.S. at 191, 114 S.Ct. 1439, the Supreme Court limited its analysis to whether "Central Bank was 'secondarily liable under § 10(b) for its conduct in aiding and abetting the fraud.'" *Id.* (quoting complaint).

The Supreme Court did not reach the issue of the extent to which participants in a securities fraud scheme are primary violators of § 10(b). The narrow focus of the *Central Bank* analysis is shown by the Supreme Court's discussion of "directly or indirectly":

> The federal courts have not relied on the "directly or indirectly" language when imposing aiding and abetting liability under § 10(b), and with good reason. There is a basic flaw with this interpretation. According to respondents and the SEC, the "directly or indirectly" language shows that "Congress ... intended to reach all persons who engage, even if only indirectly, in proscribed activities connected with securities transactions." The problem, of course, is that aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.

*Id.* at 176, 114 S.Ct. 1439. *Central Bank* did not examine the effect of § 10(b)'s "directly or indirectly" language on the standards for evaluating primary (as opposed to secondary) liability in a scheme case.

### C. Scheme Cases

All parties acknowledge that the post-*Central Bank* caselaw on fraudulent

schemes is slender. Two such decisions were issued by the Second Circuit: *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2nd Cir.1996) and *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107 (2nd Cir.1998). These cases are of limited utility because they did not arise in the private litigation context and involved significantly different factual circumstances.

In *First Jersey*, the Second Circuit held § 10(b) applicable to a participant who directed a fraudulent scheme, but did not personally interact with the market. 101 F.3d at 1471–72. The *First Jersey* plaintiffs accused a securities-trading firm and its owner/director, Robert E. Brennan, of operating "a massive and coordinated system of fraudulent practices to induce its customers to buy certain securities from the Firm at excessive prices unrelated to prevailing market prices." *Id.* at 1456. Brennan argued that even if the firm had defrauded its customers, he could not be held liable as a primary violator of § 10(b), as he had not personally interacted with the firm's customers. *See id.* at 1471. The Second Circuit disagreed, relying on the lower court's findings "that Brennan was engaged in the purposeful planning of the pattern and repeated format of trading in which the respective branch offices engaged and that he 'orchestrated every facet of [the firm's] branch office network.' " *Id.* at 1471–72 (citation omitted); *see also Mishkin v. Ageloff,* No. 97–CV–2690–LAP, 1998 WL 651065 at *17–19 (S.D.N.Y. Sept.23, 1998) (holding that plaintiffs had stated a claim under § 10(b) by alleging that defendant "participated in a fraudulent scheme" by directing, along with a co-defendant, securities brokers that implemented the scheme).

In *U.S. Environmental,* the Second Circuit held that a scheme claim under § 10(b) need not allege orchestration by the defendant. 155 F.3d at 111–12. In *U.S. Environmental,* defendant John Romano was employed at a securities-trading firm that had "agreed to participate in a scheme whereby it and other defendants, including Romano, would manipulate upward the price of the stock of U.S. Environmental, Inc." *Id.* at 109. Romano was alleged to have executed securities transactions in furtherance of the scheme. *Id.* Romano was not alleged to have conceived or directed the scheme. *See id.* On appeal, Romano argued that he could not be held "primarily liable under § 10(b) for following a stock promoter's directions to execute trades." *Id.* at 110. The Second Circuit disagreed. Quoting *First Jersey,* 101 F.3d at 1471, the Circuit Court held that "a primary violator is one who 'participated in the fraudulent scheme' " and found that "Romano f[e]ll well within the boundaries of primary liability." *Id.* at 111. Significantly, it stated: "Like lawyers, accountants, and banks who engage in fraudulent or deceptive practices at their clients' direction, Romano is a primary violator despite the fact that someone else directed the market manipulation scheme." *Id.* at 112.

Defendants argue that *U.S. Environmental* and *First Jersey* are distinguishable because both cases involved a fraudulent scheme in which the participants directly or indirectly engaged in fraudulent stock trades. In contrast, they insist that this complaint is quintessentially a fraudulent misrepresentations case. The alleged scheme included two components: (1) the formation and operation of the sham "strategic partners"; and (2) L & H's misleading financial statements about the strategic partners. Seeking to parse the alleged scheme into discrete slices, defendants argue that only L & H's misstatements directly impacted the market. In defendants' view, under the *Central Bank* paradigm, they were at worst secondary actors that assisted the

misstatements to the market by setting up, funding, and operating the entities that enabled the fraud. In defendants' mind, they were far upstream from the actual manipulation of the stock price in the market by L & H's misstatements in its quarterly and annual financial reports.

Most of the caselaw defendants rely on involves claims of fraudulent misstatements. *See, e.g., In re Kendall Square Research Corp. Sec. Litig.,* 868 F.Supp. 26, 27 (D.Mass.1994) (emphasizing that the case "relate[d] only to the alleged making of a material misstatement and [did] not relate to the commission of a manipulative act"). However, one case cited by defendants, *Primavera Familienstiftung v. Askin,* No. 95–CV–8905–RWS, 1996 WL 494904 (S.D.N.Y. Aug.30, 1996) is worth mentioning because the court distinguished between primary and secondary liability in a scheme case. The *Primavera* complaint asserted claims that certain broker dealers participated in a fraudulent scheme under clauses (a) and (c) of Rule 10b–5, by selling and financing high risk securities to hedge funds, which then misrepresented to investors that their investment strategy was market neutrality. *Id.* at *1–4, *6. Acknowledging that "a complaint will withstand a motion to dismiss if it adequately alleges that a party substantially participated in the alleged manipulative or deceptive scheme," *id.* at *7, the district court held that allegations that the broker defendants created, supplied, and financed the sale of the securities "at their core, still constitute, at most, aiding and abetting." *Id.* It reasoned: "[S]ince the Complaint is, regardless of how it is framed, one of misrepresentation, the Dealers could not have committed a primary violation of Rule 10b–5 because they were not alleged to have consciously deceived the Funds' investors." *Id.*

Taking the holistic perspective, plaintiffs contend that the two components of the strategic-partner scheme were inextricably linked: That is, but for the formation and operation of the sham shell companies and the bogus licensing transactions, L & H could not have used the sham companies to hide research and development expenses, create fictitious revenue, and ultimately overstate profits in L & H's financial reports. Plaintiffs argue that a scheme or course of business under Rule 10b–5(a) and (c) can include misleading financial statements that might also qualify as predicates for Rule 10b–5(b). *Cf. Peil v. Speiser,* 806 F.2d 1154, 1162 (3rd Cir.1986) (recognizing the "uncertainty surrounding the differences and overlap among the three clauses of the rule 10b–5," but finding a "distinction between clause (b) on the one hand, and clauses (a) and (c) on the other, in that the latter arguably requires proof of a *scheme* to defraud, whereas the clause (b) is indisputably satisfied by a single fraudulent action.").

■ While both sides make strong arguments in an area of sparse law, the better reading of § 10(b) and Rule 10b–5 is that they impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.

To be sure, the line between primary and secondary liability in a scheme or course of business case can be murky and fact-sensitive. Unlike *Primavera,* where the stocks sold by the broker defendants to the hedge funds were simply high-risk, the complaints here have alleged that most of the strategic partner entities were com-

plete shams. If it turns out that the entities were viable, legitimate, ongoing strategic partners, and the only fraud was misrepresenting the relationship between L & H and the strategic partners, *Primavera* would support a conclusion of lack of primary liability under § 10(b).

■ A closely related issue is the requirement that plaintiffs demonstrate reliance on the manipulative or deceptive device. Consistent with its interpretation of the reach of § 10(b) and Rule 10b–5, the Court holds that plaintiffs can satisfy the reliance requirement by alleging facts sufficient to show (1) that defendants substantially participated in a fraudulent scheme; and (2) when the scheme is viewed as a whole, the plaintiffs relied on it.

As discussed below, class plaintiffs have alleged facts sufficient to show that FLV and Mercator—but not Verbeke—substantially participated in the strategic-partner scheme. Moreover, plaintiffs have alleged facts sufficient to show that they relied on the strategic-partner scheme, under the fraud-on-the-market theory. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 241–250, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (discussing fraud-on-the-market theory). Class plaintiffs allege that the strategic-partner scheme artificially inflated L & H's profits, which in turn artificially inflated the L & H common stock price during the class period. Specifically, class plaintiffs allege that the scheme allowed L & H to book fraudulently $79 million in license revenue from the strategic partners. The strategic partners accounted for 10% of L & H's 1998 reported revenues, and 25% of

its 1999 reported revenues. Moreover, the scheme allowed L & H to amortize research and development expenses that it otherwise would have had to book as current expenses. Finally, plaintiffs in the related cases allege that they relied on actual oral and written misrepresentations of FLV and Mercator concerning the existence of real strategic partners, not sham companies with no employees, financial resources, or technical expertise.[3]

## D. The Defendants

■ This suit is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *E.g., Lernout I,* 208 F.Supp.2d at 82–83. While the PSLRA does not address fraudulent-scheme claims, *see* 15 U.S.C. § 78u–4(b), Rule 9(b)'s admonition that the "circumstances constituting fraud ... shall be stated with particularity" applies to allegations of scheme participation.

The First Circuit recently summarized the scienter requirement of the PSLRA:

Liability under section 10(b) and Rule 10b–5 also requires scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Under the PSLRA, the complain must state with particularity facts that give rise to a "strong inference" of scienter, rather than merely a reasonable inference.

The inference of scienter must be reasonable and strong, but need not be irrefutable. Scienter may be demon-

---

**3.** By establishing reliance, plaintiffs have alleged sufficient facts to support transaction and loss causation. *See e.g., Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3rd Cir.2001) ("Reliance, or transaction causation, establishes that but for the fraudulent misrepresentation, the investor would not have purchased or sold the securi-

ty."); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 96 (2nd Cir. 2001) (holding that loss causation "has been likened to the tort concept of proximate cause, meaning that in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence" of the securities fraud).

strated by indirect evidence, and may extend to a form of extreme recklessness that "is closer to a lesser form of intent." Furthermore, this circuit has rejected any rigid formula for pleading scienter, preferring to rely on a "fact-specific approach" that proceeds case by case.

*In re Cabletron Sys., Inc.*, 311 F.3d 11, 38 (1st Cir.2002) (citations omitted). Under this requirement, it is not enough to show that FLV and Mercator substantially participated in the strategic-partner scheme; they must have done so with scienter.

### 1. FLV

■ Plaintiffs' allegations suffice to show that FLV substantially participated in the strategic-partner scheme, by owning and funding multiple strategic partners. Plaintiffs allege that FLV owned and/or funded eight of the thirty strategic partners. Specifically, in 1999 FLV invested $8 million for a 49% stake in four start-up companies based in Singapore. Also in 1999, FLV paid $10 million to obtain ownership of four additional start-ups in Singapore; $8 million of FLV's money was used to pay license fees to L & H.

Although FLV argues that it was simply a venture capital fund investing in legitimate start-up companies, the allegations create a strong inference of FLV's scienter with respect to the sham entities. In particular, plaintiffs have pled allegations that support FLV's knowledge and motive. Most importantly, plaintiffs have alleged that the strategic partners themselves were mere shells, with no technical, financial or personnel resources to meet their purported mission, and it is reasonable to infer that FLV knew that these shell companies could not meet their purported mission. In addition, plaintiffs have alleged that (1) FLV was tightly connected to L & H, partly as a result of Lernout and Hauspie having founded FLV and continuing to exercise control over FLV after leaving their director positions; indeed, Hauspie and Lernout served on FLV Fund's board at all relevant times; (2) L & H sales representatives noted that there was no real separation between FLV and L & H, and treated them as "the same thing"; (3) FLV participated in the Dictation fraud, a precursor to the strategic-partner scheme; and (4) FLV's Hardeman allegedly lied to KPMG, the auditor for both FLV Fund and L & H, by telling KPMG that the LDCs were independent third parties. In sum, plaintiffs' allegations support FLV's knowledge of how the strategic-partner scheme worked.

As for motive, class plaintiffs allege that FLV profited handsomely from the Dictation fraud and had similar financial incentives to participate in the strategic-partner scheme, namely, the prospect of a striking return on investment with minimal risk. FLV's risk was minimal, given L & H's general practice of exercising its options to buy the strategic partners at purchase prices substantially in excess of the costs of setting up, funding, and operating the strategic partner.

FLV suggests that its strategic-partner transactions were not shams, but rather involved customers that at a later point in time became unable to satisfy their obligations. If it turns out that FLV only invested in viable entities, but L & H fraudulently misrepresented the relatedness of those entities, FLV's allegation that at worst it was an aider and abettor would have more force. However, it is inappropriate to resolve that dispute at this preliminary stage.

### 2. Mercator

Plaintiffs' allegations also suffice to show that Mercator substantially participated in the strategic-partner scheme, by owning

and funding multiple strategic partners. Plaintiffs allege that Mercator was the ultimate owner of sixteen of the thirty start-up LDCs and CLDCs. Mercator owned these start-ups through several intermediary entities. The start-ups were directly owned by Velstra, a Singapore-based company. Velstra is 100% owned by. Language Development Fund ("LDF"), which in turn is 96% owned by Mercator. During the class period, Mercator invested $2 million in LDF, and loaned LDF an additional $10 million to be repaid by September of 1999. These funds were then used by the LDCs to pay L & H, inflating the L & H's purported revenues. The 16 start-ups owned by Mercator paid a total of $53 million in licensing fees to L & H during 1998 and 1999.

Plaintiffs' allegations also create a strong inference of Mercator's scienter: (1) Mercator's chairman, Verbeke, was also a named partner at L & H's and FLV's chief Belgian law firm, Loeff Claeys Verbeke; (2) Verbeke was present at L & H Board meetings where related-party transaction were discussed; and (3) Tony Snauwaert, the delegate-director/manager of the Mercator-owned LDF, was described as "Pol Hauspie's right hand" in a January 24, 2001 article in *De Financieel–Exonomische Tijd,* a Belgium business publication. Moreover, plaintiffs have alleged that the strategic partners themselves were mere shells, with no financial resources, technical expertise, or employees to meet their purported mission. Given that Mercator owned sixteen of these shells, it is highly likely that Mercator knew the shells could not meet their purported mission, which in turn supports Mercator's knowledge of the shells' true end: fraud. In sum, class plaintiffs' allegations support Mercator's knowledge of how the strategic-partner scheme worked.

As for motive, class plaintiffs allege that strategic-partnership scheme offered Mercator the prospect of striking returns on investment, with minimal risk. Moreover, Mercator held an equity interest in L & H, such that the artificial inflation of L & H stock increased the value of Mercator's holdings.

### 3. Verbeke

■ The Amended Class Complaint does not include a single allegation of how Verbeke participated in the scheme. Moreover, class plaintiffs have not argued that the acts of Mercator (of which Verbeke was chairman) should be attributed to Verbeke. Verbeke properly notes that the theory of vicarious liability is inapplicable, as this theory holds principals liable for the acts of their agents, not agents liable for the acts of their principals. *See generally In re Atlantic Fin. Mgmt., Inc.,* 784 F.2d 29, 31–32 (1st Cir.1986).

For these reasons, Verbeke's motions to dismiss the class action's federal securities claims against him must be allowed.

### II. Common Law Aiding–and–Abetting Claims

■ The Stonington and Baker/Bamberg plaintiffs assert aiding-and-abetting-common-law-fraud claims against Verbeke, and all the plaintiffs from the related cases assert aiding-and-abetting claims against FLV and Mercator. Allegations of active participation in a fraudulent scheme, with scienter, sufficient to establish primary liability under § 10(b)-5, will *a fortiori* suffice to show aiding and abetting common law fraud. Therefore, the only claim necessary to discuss involves Verbeke, whose participation was not alleged with sufficient particularity in the Amended Class Complaint.

■ The Stonington Amended Complaint alleges that Verbeke, Chairman of Mercator, general counsel to L & H, and

attendee at L & H board meetings, provided legal services in connection with the establishment of the "strategic partners" and L & H's dealings with the "strategic partners." The Stonington Amended Complaint also alleges: "Upon information and belief, the legal work involved in creating these start-ups [the 30 strategic partners] was performed in whole or in part by Verbeke, in his capacity as a partner of Loeff Claeys." The Baker/Bamberg complaints make virtually identical allegations.

These allegations suffice to show that Verbeke provided "substantial assistance or encouragement" to the scheme participants—L & H, FLV, and Mercator—and that Verbeke did so with knowledge that the other parties were breaching a duty and unlawful intent to assist those parties. *Austin v. Bradley, Barry & Tarlow, P.C.,* 836 F.Supp. 36, 40 (D.Mass.1993); *see also Lernout IV,* 236 F.Supp.2d at 90–91.

### *ORDER*

For the reasons stated above, the Court ***ALLOWS*** Verbeke's motion to dismiss the federal securities claim against him (No. 00–CV–11589–PBS at Docket No. 220) but ***DENIES*** Verbeke's motion to dismiss the aiding-and-abetting-common-law-fraud claims against him (No. 02–CV–10303–PBS at Docket No. 98, No. 02–CV–10304–PBS (consolidated) at Docket No. 90) and ***DENIES*** all of FLV's and Mercator's motions to dismiss (No. 00–CV–11589–PBS at Docket Nos. 177 and 199, No. 02–CV–10302–PBS at Docket Nos. 100 and 108, No. 02–CV–10303–PBS at Docket Nos. 83 and 86, and No. 02–CV–10304–PBS (consolidated) at Docket Nos. 93 and 95). The Court will address the motions to dismiss for lack of personal jurisdiction at a later proceeding.